1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DOROTHY CANTU,<br><br>            Plaintiff/Claimant,<br><br>      v.<br><br>CAROLYN COLVIN, Acting Commissioner,<br>Social Security Administration,<br><br>            Defendant. | Case No. 5:13-CV-01621-RMW<br><br>**ORDER DENYING PLAINTIFF'S<br>MOTION FOR SUMMARY<br>JUDGMENT AND GRANTING<br>DEFENDANT'S CROSS-MOTION FOR<br>SUMMARY JUDGMENT**<br><br>[Re: Docket No. 20] |

## I.   INTRODUCTION

Plaintiff Dorothy Cantu ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) for review of the final decision by Carolyn Colvin, the Acting Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claims for disability benefits under the Social Security Act. Plaintiff moves for summary judgment and requests that the case be remanded for an award of benefits. Commissioner cross-moves for summary judgment. The court DENIES plaintiff's motion for summary judgment and GRANTS commissioner's motion for summary judgment.

## II. BACKGROUND

**A. Procedural History**

Plaintiff filed her application for Social Security disability benefits under Title II of the Social Security Act on November 4, 2009, alleging that she was unable to work due to a disability commencing on October 16, 2009. Certified Administrative Record ("AR") 216. After her claim was denied on March 25, 2010, plaintiff filed a request for reconsideration, which was denied on September 23, 2010. *Id*. at 112-16, 123-27. On October 14, 2010, plaintiff then requested a hearing before an Administrative Law Judge ("ALJ") and subsequently retained counsel. *Id*. at 117. On December 17, 2011, the ALJ issued a decision, finding that plaintiff had multiple severe impairments but was not disabled under the Social Security Act. *Id*. at 11-24. The decision became the commissioner's final decision when the Appeals Council denied review on March 22, 2013. *Id*. 1-3.

Subsequently, on April 10, 2013, plaintiff appealed to the Northern District of California under 42 U.S.C. 405(g), seeking review of the final decision of the commissioner. On March 31, 2014, plaintiff moved for summary judgment and remand to the ALJ for an immediate award of benefits. Dkt. No. 16, Motion for Summary Judgment ("Mot."). Commissioner cross-moved for summary judgment on June 6, 2014. Dkt. No. 18, Memorandum In Support Of Defendant Commissioner's Cross-Motion For Summary Judgment And In Opposition To Plaintiff's Motion For Summary Judgment ("Opp.").

**B. The ALJ's Findings and Analysis**

Plaintiff initially alleged that she was severely impaired due to rheumatoid arthritis and osteoarthritis. After further testing, plaintiff added Reiter's Syndrome, asthma, supraventricular tachycardia ("SVT"), hyperthyroidism, and a depressive disorder to her allegations. Plaintiff alleged that she ceased working after being fired from Happy Hollow Park and Zoo because she needed to take frequent rest breaks and was unable to stand for more than eight minutes at a time. AR 79-80. The ALJ addressed whether the plaintiff was disabled under section 1614(a)(3)(A) of the Social Security Act, applying the five-step sequential evaluation process established by the Social Security

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   Administration for determining if a plaintiff is disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).[1]

2   At step one, the ALJ determined that the plaintiff had "not engaged in substantial gainful activity

3   since November 17, 2009." AR 13. At step two, the ALJ determined that the plaintiff suffered from

4   several severe impairments, including Reiter's Syndrome, obesity, asthma, and a depressive

5   disorder. *Id.* at 13-15. However, the ALJ determined that plaintiff's SVT, rheumatoid arthritis, and

6   hyperthyroidism were not severe impairments. *Id.* at 15. At step three, the ALJ determined that the

7   plaintiff did "not have an impairment or combination of impairments that meets or medically equals

8   the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." *Id.* at

9   16.

10      At step four, the ALJ determined that the plaintiff had "the residual functional capacity to

11  perform sedentary work as defined in 20 C.F.R. § 416.967(a) except that she must change positions

12  every thirty minutes for one to two minutes; c[ould] perform postural functions no more than

13  occasionally; and c[ould not] be in work environments that have any concentrated exposure to

14  pulmonary irritants." *Id.* at 19. The ALJ also found that the plaintiff had "moderate limitation in her

15  ability to understand, remember, and carry out detailed instructions; moderate limitation in her

16  ability to work in coordination with or proximity to others without being distracted by them; and

17  moderate limitation in her ability to interact appropriately with the general public." *Id.* at 18-19. In

18  ─────────────

19  [1] Pursuant to 20 C.F.R. §§ 404.1520(a), 416.920(a), the Social Security Administration follows a

20  five-step sequential inquiry for determining whether an individual is disabled. At each step, a
    determination that the plaintiff is disabled or not disabled is conclusive and will prevent the ALJ

21  from moving to the next step. *Id.* During the first four steps, the burden is on the plaintiff to show
    she is disabled. *See Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989). During the first step, the

22  ALJ considers whether the plaintiff has undergone substantial gainful activity during the time in
    question. 20 C.F.R. §§ 404.1520, 416.920. If the plaintiff has not undergone substantial gainful

23  activity, the ALJ proceeds to the second step and determines if the plaintiff has a medically severe
    impairment that has lasted or is expected to last "for a continuous period of [twelve] months." *Id.*

24  *See also* 20 C.F.R. § 404.1509. At step three, the ALJ determines if the plaintiff's disability equals
    or exceeds one of the impairments listed in Appendix 1 to Subpart P of 20 C.F.R. § 404. If the

25  plaintiff's disability does equal or exceed the listed impairments, then the plaintiff is concluded to
    be disabled. 20 C.F.R. §§ 404.1520, 416.920. Otherwise, the ALJ proceeds to step four, where she

26  must determine the plaintiff's residual functional capacity and determine if the plaintiff can perform
    any of her past work. *Id.* If the plaintiff is unable to return to previous types of employment, the

27  "burden then shift[s] to the government to prove that [plaintiff] could perform other work that exists
    in the national economy." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

28

conducting her analysis, the ALJ stated that she considered all of plaintiff's symptoms and weighed whether they could "reasonably be accepted as consistent with the objective medical evidence and other evidence," based on the requirements of 20 C.F.R. §§ 416.927, 416.929 and SSRs 96-2p, 96-4p, 96-5p, 96-6p, 96-7p, and 06-3p. AR 19. The ALJ also followed a two-step process. In the first step, she determined whether there was an underlying medically determinable physical or mental impairment[2] that could reasonably be expected to produce the plaintiff's pain or other symptoms. In the second step, the ALJ evaluated the intensity, persistence, and limiting effects of the plaintiff's symptoms to determine the extent to which they limit the plaintiff's functioning. *See* 20 C.F.R. § 404.1529. The ALJ concluded that plaintiff was "not fully credible to the extent of her alleged functional limitations and severity of subjective complaints." AR 19. Specifically, the ALJ highlighted "work activity involving significant interpersonal interactions and physical exertion . . . inconsistent with the subjective allegations," "inconsistent compliance with [claimant's] medications," plaintiff's "capabilities for a wide range of activities of daily living," and "psychiatric hospitalization in November 2010." Consequently, the ALJ concluded that "claimant's medically determinable impairments could reasonably be expected to cause few of the alleged symptoms; the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Id.* at 19-20.

At step four, the ALJ, relying on a vocational expert, compared plaintiff's residual functional capacity with the demands of her past work and determined that she would be unable to perform her past relevant work. AR 22. First, the ALJ assumed that "the individual has capacity for sedentary exertion but needs to change position every 30 minutes, for one to two minutes; and can perform postural functions no more than occasionally." AR 95-96. The ALJ also eliminated work environments that "have any concentrated exposure to fumes, odors, dust, [or] other pulmonary irritants." Given those hypothetical impairments, the vocational expert determined that plaintiff could not perform any of plaintiff's previous work. *Id*. at 96.

---

[2] A "medically determinable physical or mental impairment" is an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques.

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

At step five, the ALJ continued asking the vocational expert questions involving plaintiff's alleged impairments. As an extension of her first question, the ALJ asked if there existed any work such a person could perform. The vocational expert suggested that there were several types of work available to a hypothetical person with plaintiff's background and with the hypothetical impairments, totaling approximately 70,000 jobs in California. AR 96-97.

For her second hypothetical, the ALJ asked if anything would change if the hypothetical person also had a moderate limitation to her "ability to understand, remember and carry out detailed instructions; had a moderate limitation in the ability to work in coordination or proximity to others without being distracted by them; and a moderate limitation in the ability to interact appropriately with the general public." *Id.* at 97. The ALJ also defined moderate "to be that the individual has more than a slight limitation in this area but the individual could still—is still able to perform the function satisfactorily as it's defined in the Form HA-1152-U3." *Id*. The vocational expert replied that it would not change the available job market for the hypothetical person compared to the first hypothetical. *Id*.

For the third hypothetical, the ALJ reused the limitations from the first hypothetical: that the person had to change positions every 30 minutes for one to two minutes and could not work around pulmonary irritants. *Id*. She then added the limitation that the individual was only able to remember "simple routines and instructions; they're able to maintain and sustain a work schedule with simple tasks, and they're able to be supervised; able to interact with coworkers; and able to handle minimal public contact; and they're able to adapt with typical . . . stress and changes in the work place." *Id*. at 97-98. The vocational expert again responded that it would not change the available jobs compared to the first hypothetical. *Id*.

For the fourth hypothetical, the ALJ added to the third hypothetical that the individual is "limited to frequent bilateral fingering." AR 99. The vocational expert testified that no jobs would exist that such a hypothetical person could perform. *Id*.

Plaintiff then posed two hypotheticals to the vocational expert. In the first, she assumed the limitations of hypotheticals two and three, but added in that the individual would have to miss four

days of work per month. AR 100. The vocational expert responded that such actions would preclude the jobs previously available under those hypotheticals. *Id*. Plaintiff then questioned the meaning of "moderate" and changed it to mean the person "could satisfactorily perform work in those settings 80 percent of the time but not 20 percent of the time." *Id.* at 100. The vocational expert again responded that such a person would not be employable. *Id.* at 100-01.

Relying on the vocational expert's testimony and rejecting that plaintiff is limited to frequent bilateral fingering, the ALJ determined that, "considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* at 23; *see also* 20 C.F.R. §§ 416.969, 416.969(a).

**C. Plaintiff's Age, Educational, and Vocational History**

Plaintiff was born on May 11, 1971. AR 52. She failed to graduate from high school, but acquired a GED by 2004. *Id.* 82. After attending Bethany University and living on campus for one semester, plaintiff moved back home and completed her bachelor's degree in early childhood education over the internet. *Id.* at 82-83. Plaintiff received her degree in 2008. *Id.* at 82.

Since 1996, plaintiff has had a very limited employment history. *Id.* at 75-81. Plaintiff worked for six to seven months at a KMART, during which she averaged twenty hours a week and lifted objects weighing between twenty and fifty pounds. *Id.* at 77. Plaintiff also worked part-time as a cashier during one Christmas season for Michael's Arts and Crafts, during which she engaged in no substantial lifting. *Id.* at 77-78. Between 2002 and 2004, plaintiff was employed full-time as elder care. *Id.* at 78-79. Plaintiff then worked for nine months as a preschool teacher. *Id.* at 75-76. During this time, she needed to interact with children and pick them up, some of whom were in excess of fifty pounds. *Id.* at 76. Finally, plaintiff attempted to work at Happy Hollow Park & Zoo ("Happy Hollow") when it reopened in 2010, but was fired after two weeks. *Id.* at 79-91. During her time at Happy Hollow, plaintiff averaged 18 breaks over her four hour shift and did no substantial lifting. *Id.* at 81.

United States District Court
For the Northern District of California

1    Plaintiff also took part in several daily activities. She volunteered with Catholic Charities as

2    a choral instructor for fifth and sixth grade children. *Id.* at 282. Once a month, plaintiff went

3    shopping with her mother. *Id.* at 185. Plaintiff ran errands with friends and family four times a

4    week. *Id.* at 186. She regularly went to church and the bookstore, while occasionally making trips to

5    Starbucks. *Id.*

6    **D. Plaintiff's Medical History**

7    Plaintiff alleges disability starting October 16, 2009 due to rheumatoid arthritis,

8    osteoarthritis, Reiter's Syndrome, obesity, asthma, supraventricular tachycardia, hyperthyroidism,

9    and depression. AR 13, 160, 167-68, 240, 248-49. Plaintiff suffers from severe obesity. *Id.* at 67.

10   Her weight has fluctuated from 219 pounds in October 2010 to a high of 380 pounds as of the time

11   of the hearing, in November 2011. *Id.* at 90-91. Additionally, plaintiff has been diagnosed with

12   asthma, chronic hyperthyroidism, knee pain due to valgus deformations, and supraventricular

13   tachycardia. *Id.* at 312, 351, 395.  X-rays show degeneration of the lumbar vertebrae due to

14   ankylosing spondylitis and osteoarthritis in both knees. *Id.* at 387, 93. Finally, plaintiff alleges hand

15   pain with stiffness, weakness, and reduced range of motion. *Id.* at 317.

16   Plaintiff has been treated at the Santa Clara Valley Medical Center ("SCVMC") since 2005,

17   primarily by Dr. Lynn Ngo, her primary care physician, and Dr. Thomas Bush, the chief of the

18   Division of Rheumatology at SCVMC. With respect to plaintiff's mental health, in July 2010, Dr.

19   Maria Acenas conducted a consultative psychiatric evaluation and confirmed a diagnosis of

20   depression. AR 16, 324. In September 2010, plaintiff expressed suicidal thoughts to her social

21   worker and was involuntarily committed for four days. *Id.* at 486. Her treating psychiatrist, Dr.

22   Giselda Tan, diagnosed a major depressive disorder. *Id.* at 481. On November 12, 2010, plaintiff

23   was again involuntarily committed following an alleged overdose of Ambien; however, plaintiff's

24   toxicology report came back negative for all medications. *Id.* 501-02. Dr. Tan continued to treat

25   plaintiff through April 12, 2011. *Id.* at 465. The court discusses each physician's records, along with

26   the ALJ's analysis of those records.

27

28

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

*United States District Court*
For the Northern District of California

### 1.  Primary Care Physician: Dr. Ngo

On July 16, 2007, plaintiff visited Dr. Lynn Ngo. AR 395-96. Dr. Ngo noted that plaintiff suffered from asthma, arthritis, obesity, and SVT. AR 396. Plaintiff last saw Dr. Ngo on March 1, 2010. In addition to her chronic problems of lower back pain, obesity, and hyperthyroidism, plaintiff was again diagnosed with asthma and was prescribed a new set of medications. AR 367-69. Dr. Ngo was listed as plaintiff's primary care physician as late as June 16, 2010. AR 360.

The ALJ notes that Dr. Ngo's opinion in July 2009 was that plaintiff should be able to work, despite her tachycardia and hyperthyroidism. AR 20. The ALJ appears to give no further weight to Dr. Ngo's opinion.

### 2.  Examining Physician: Dr. Tom

Plaintiff visited Dr. Andrea Tom in the endocrinology and diabetes clinic on October 16, 2009, following a referral from Dr. Ngo. AR 248-52. Dr. Tom noted that plaintiff had subclinical hyperthyroidism starting in February 2008. *Id.* at 250. She also noted the possibility that plaintiff suffered from mild Graves' disease rather than hyperthyroidism. *Id.* Dr. Tom determined that the SVT, while unrelated to the hyperthyroidism, could be exacerbated by it. *Id.* She prescribed medication for plaintiff in order to alleviate the condition. *Id.*

Based on Dr. Tom's records, the ALJ determined that plaintiff's hyperthyroidism is not a severe impairment. *Id.* at 15. The ALJ took note of the mild nature of plaintiff's hyperthyroidism. *Id.* The ALJ also noted that the laboratory tests ordered by Dr. Tom were not in the record and that the plaintiff had not filled her medications. *Id.*

The ALJ credits Dr. Tom's assessment and plaintiff's subsequent failure to fill her medications in determining that plaintiff's hyperthyroidism is not a severe impairment. Dr. Tom's conclusions were limited to patient's hyperthyroidism and its interactions with her SVT.

### 3.  Treating physician: Dr. Bush

Dr. Bush stated on July 28, 2007 that plaintiff had been a patient of the Arthritis Clinic at SCVMC over the past year. However, the record does not reflect plaintiff being treated by Dr. Bush himself until June 16, 2010. AR 361-64. Dr. Bush followed up with plaintiff on October 7, 2010, before filing a physical residual functional capacity questionnaire on April 29, 2011. *Id.* at 346-50,

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

352-54, 361-64. At the June appointment, Dr. Bush noted that plaintiff had full range of motion of her hands and hips, along with "no joint deformity, heat, swelling, erythema, or effusion." *Id.* at 363. The record includes plaintiff's recent weight as fluctuating between 290 and 322 pounds and that Dr. Bush believed that plaintiff had Reiter's Syndrome, along with low back pain, obesity, and hyperthyroidism. *Id.* at 361-62. He also ordered a disability note, which was completed on the same day. *Id.* at 364.

At the October appointment, Dr. Bush wrote that the Reiter's Syndrome had started in 2004 and that plaintiff's back pain had worsened and was intermittent, but had improved with medications. *Id.* at 352, 354. Dr. Bush also recorded that no hand synovitis was apparent. *Id.* at 354.

In the residual functional capacity questionnaire, Dr. Bush diagnosed Reiter's Syndrome with a fair prognosis. *Id.* at 346. He stated that plaintiff was in chronic pain and was incapable of even low stress jobs. *Id.* at 347. Dr. Bush opined that plaintiff can sit for up to thirty minutes and stand for up to five minutes. *Id*. Further, plaintiff could stand and walk for less than two hours of an eight hour work day, and could only sit for approximately two hours, with hourly breaks for up to ten minutes. *Id.* at 348. Dr. Bush found that plaintiff could rarely lift objects weighing less than ten pounds and could never lift objects weighing more than ten pounds. *Id*. Plaintiff's ability to grasp and manipulate fine objects was reduced to thirty percent of the day. *Id*. Additionally, Dr. Bush opined plaintiff was likely to need more than four days off from work every month due to her impairments. *Id*.

The ALJ considered Dr. Bush's opinion in her assessment of plaintiff's physical impairments, but gave it no weight. She found it "both internally inconsistent with [Dr. Bush's] own treatment notes as well as inconsistent with the record as a whole." *Id.* at 21. Dr. Bush's opinion is supported by only limited treatment notes in the record, as many of Dr. Bush's treatment notes are missing. *Id*. Further, Dr. Bush's own physical findings and diagnostic testing indicate minimal abnormalities in the plaintiff. *Id*. The ALJ took note that Dr. Bush "indicated that the signs, symptoms, and limitations first applied in January 2004," despite the fact that plaintiff acquired her degree in early childhood education and worked at a preschool in that time period.

1

### 4.  Consultative Examiner: Dr. Rowe

2

Dr. Rowe conducted an independent examination in February 2010. AR 282-85. She came to

3

the conclusion that plaintiff could stand for up to six hours, had no limitations in how long she could

4

sit, and had full upper-extremity strength with 4/5 grip strength. *Id.* Dr. Rowe stated that plaintiff

5

could lift between ten and twenty pounds, and was limited in working around dust, fumes, and gases

6

that could set off plaintiff's asthma. *Id.* at 20. Dr. Rowe also opined that plaintiff's inflammation in

7

the hands limited her ability to manipulate objects. *Id.* Dr. Rowe noted that plaintiff came in

8

carrying her backpack in her left hand and a water bottle and cell phone in her right hand. *Id.* at 14.

9

Dr. Rowe further observed that plaintiff did not need an assistive device to walk or need assistance

10

in order to stand up from a sitting position. *Id.* However, Dr. Rowe also found that plaintiff had

11

difficulty lying on her back due to back pain. *Id.*

12

The ALJ applied limited weight to the opinion of Dr. Rowe. The ALJ considered Dr. Rowe's

13

opinion as to plaintiff's ability to stand, sit, and manipulate objects when making her determination.

14

AR 20. However, the ALJ afforded no weight to Dr. Rowe's opinion about plaintiff's ability to use

15

her hands beyond the subjective grip strength rating, stating that the objective medical evidence

16

"does not show inflammation in the claimant's hands or upper extremities." *Id.*

17

### 5.  Non-Examining Medical Expert: Dr. Moore

18

On November 15, 2011, Dr. Sterling Moore testified as a medical expert before the ALJ.

19

AR 65-75. Using the submitted record, he determined that the record supported a diagnosis of

20

Reiter's Syndrome and that plaintiff's SVT and hyperthyroidism did not interfere with her daily life.

21

*Id.* at 66-67. Dr. Moore also determined that plaintiff could lift and carry up to 10 pounds, stand and

22

walk for two to four hours, and sit for up to six. *Id.* at 69. However, he did not find support in the

23

record for Dr. Bush's conclusions that plaintiff could only grasp and manipulate objects for thirty

24

percent of a work day. *Id.*

25

The ALJ assigned "great weight" to Dr. Moore's opinion that the plaintiff is capable of

26

sedentary work. AR 21. She also gave great weight to Dr. Moore's opinion that plaintiff would need

27

to change position every thirty minutes and that she should avoid exposure to substances that could

28

set off her asthma. *Id.* Finally, Dr. Moore indicated that the only objective finding in the record

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    indicating that plaintiff had limited grip strength was that of Dr. Rowe, who determined that

2    plaintiff had 4/5 grip strength. *Id*. However, Dr. Moore opined that no other evidence in the record

3    indicated inflammation of plaintiff's hands or fingers that could have led to decreased ability to use

4    plaintiff's upper extremities. *Id*. Dr. Moore "declined to specify whether the medical record

5    corroborates any mental impairment due to his lack of expertise in the field of psychiatry." *Id*. at 14.

6        **6. Treating Psychiatrist: Dr. Tan**

7        Dr. Tan started treating plaintiff in October 2010, following plaintiff's involuntary

8    commitment on September 3, 2010 and subsequent release. AR 483, 486. On October 6, 2010, Dr.

9    Tan made the following diagnoses of plaintiff's mental disorders based on the *Diagnostic and*

10   *Statistical Manual of Mental Disorders*, 4th ed. text ("DSM-IV").[3] AR 481. On Axis I, Dr. Tan

11   indicated that plaintiff has a major depressive disorder, recurrent, with psychotic features. *Id*. On

12   Axis II, Dr. Tan found that plaintiff was depressed. *Id*. On Axis III, Dr. Tan determined that plaintiff

13   suffers from osteoarthritis, supraventricular tachycardia, and asthma. *Id*. On Axis IV, Dr. Tan noted

14   that plaintiff has problems related to the social environment, occupational problems, and economic

15   problems. *Id*. On Axis V, Dr. Tan indicated that plaintiff had a GAF[4] of 45-50. *Id*. Dr. Tan's reports

16   ───────────────────

17   [3] There are five axes in the DSM diagnostic system, each relating to a different aspect of a mental
     disorder:
18   Axis I: This is the top-level diagnosis that usually represents the acute symptoms that need
     treatment; Axis I diagnoses are the most familiar and widely recognized (e.g., major depressive
19   episode, schizophrenic episode, panic attack). Axis I terms are classified according to V-codes by
     the medical industry (primarily for billing and insurance purposes).
20   Axis II: This is the assessment of personality disorders and intellectual disabilities. These disorders
     are usually life-long problems that first arise in childhood.
21   Axis III: This is the listing of medical and neurological conditions that may influence a psychiatric
     problem. For example, diabetes might cause extreme fatigue, which may lead to a depressive
22   episode.
     Axis IV: This section identifies recent psychosocial stressors – the death of a loved one, divorce,
23   loss of a job, etc. – that may affect the diagnosis, treatment, and prognosis of mental disorders.
24   Axis V: This section identifies the patient's level of function on a scale of 0-100, where 100 is the
     highest level of functioning. Known as the Global Assessment of Functioning ("GAF") Scale, it
25   attempts to quantify a patient's ability to function in daily life.
     Psy*Web*.com
26   [4] The GAF Scale: 91-100: "Superior functioning in a wide range of activities, life's problems never
     seem to get out of hand, is sought out by others because of his or her many positive qualities. No
27   symptoms." 81-90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good
     functioning in all areas, interested and involved in a wide range of activities, socially effective,
28
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING
     DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

following plaintiff's second involuntary commitment showed steady improvement in plaintiff's mental state with proper medication. *Id.* at 465-83. At plaintiff's November 15, 2010 appointment, Dr. Tan marked plaintiff's major depressive disorder as being without psychotic features. *Id.* at 472. By April 2011, plaintiff reported that she was feeling better, was taking her medications, and was sleeping more and eating better. *Id.* at 465. She was also spending more time with family and friends and getting out and helping others more. *Id.* Her last visit shows that she had stopped seeing her psychiatrist and had returned to being depressed. *Id.* at 464.

The ALJ credited Dr. Tan's overall assessment that plaintiff possessed a severe medical impairment, but that she was improving. The ALJ referenced Dr. Tan's notes that "the claimant reported not feeling depressed because her relationship with her mother had been going well" and that plaintiff's "mental status examinations were essentially unremarkable." AR 16. After not seeing plaintiff for five months, Dr. Tan noted that the plaintiff was "polite and expressive, with organized

---

generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)." 71-80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument), no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." 61-70: "Some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within household), but generally functioning pretty well, has some meaningful interpersonal relationships." 51-60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." 41-50: "Serious symptoms (e.g., suicidal ideation, severe obsessional ritual, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." 31-40: Some impairment in reality testing or communication (e.g., speech is sometimes illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." 21-30: "Behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." 11-20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute)." 1-10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death."
*Diagnostic and Statistical Manual of Mental Disorders*, at 34 (4th ed. text rev. 2000).

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

thoughts, appropriate affect, normal speech, but a depressed mood." *Id.* Immediately afterward, the ALJ noted that the plaintiff's "major depressive disorder is a severe impairment." *Id*.

### 7. Consultative Examiner: Dr. Acenas

Dr. Acenas examined plaintiff on August 9, 2010, coming to the conclusion that plaintiff's Global Assessment of Functioning ("GAF") was 70. *Id.* at 324. Dr. Acenas found that plaintiff is "capable of performing her own personal grooming and hygiene." *Id*. Dr. Acenas also noted that plaintiff is "coherent and presented a cohesive history of the present illness. There were no delusions noted. She denied any hallucinations. She denied any suicidal ideation or homicidal ideation." Dr. Acenas determined that "claimant's mood was mildly depressed with appropriate affect." *Id*. Additionally, Dr. Acenas observed that plaintiff was unable to interpret the proverb "Don't cry over spilt milk," was terrified of what she would do if there was a house fire, and thought that the difference between apples and oranges was that "apples are square and oranges are round." *Id*.

Dr. Acenas also diagnosed plaintiff according to DSM-IV. On Axis I, Dr. Acenas noted dysthymia, a type of depression. AR 324. She had no diagnosis for Axis II, but noted on Axis III that plaintiff suffered from rheumatoid arthritis, osteoarthritis, asthma, and heart problems. *Id*.  On Axis IV, Dr. Acenas noted that plaintiff had multiple medical conditions and moderate unemployment. *Id*. Finally, on Axis V, Dr. Acenas noted at GAF of 70. *Id*.

While Dr. Acenas concluded that plaintiff had mild depression, she also determined that plaintiff had a good likelihood of recovery because she was receiving appropriate psychiatric treatment. Consequently, Dr. Acenas determined that plaintiff should be able to return to the workplace and complete a normal workweek. *Id.* at 325. Dr. Acenas assessed plaintiff as having "the ability to perform simple and repetitive tasks" and as "be[ing] able to accept instructions from supervisors." *Id.*

The ALJ gave "great weight to Dr. Acenas's opinion that the claimant's likelihood of recovery was good." AR 21. She took notice of Dr. Acenas's notation that plaintiff had "no limitations for basic mental work related activities pursuant to 20 C.F.R. 416.921(b)(3)-(6)." *Id*.

United States District Court
For the Northern District of California

1    Additionally, the ALJ relied upon Dr. Acenas's opinion that plaintiff would be able to complete a

2    normal workweek and deal with the stresses of a typical workplace. *Id*.

3        **8.  Social Worker**

4        On several occasions, plaintiff saw Ms. Belinda Echevarria, a Licensed Clinical Social

5    Worker ("LCSW"). AR 485-90. Ms. Eschevarria first saw plaintiff on June 23, 2010, where plaintiff

6    alleged depression, although she presented as "[w]ell dressed and groomed, friendly, and

7    cooperative." AR 489. Ms. Eschevarria recorded that plaintiff suffered from a massive depressive

8    disorder, arthritis, asthma, and SVT. *Id*. Several appointments later, on September 3, 2010, plaintiff

9    started crying, said "she didn't think she deserved to live and that she had been having ongoing

10   thoughts of suicide." *Id*. at 486. Following this revelation, plaintiff was placed on a 5150 hold and

11   involuntarily committed. *Id*.

12       The ALJ considered Ms. Echevarria's notes, but disregarded a GAF reading and Ms.

13   Echevarria's medical opinion. She noted that "a social worker is not an acceptable medical source

14   who can establish whether the claimant has a medically determinable impairment(s) pursuant to 20

15   C.F.R. § 416.916(a)." AR 16.

16       **9.  Other Physicians**

17       The administrative record indicates that plaintiff saw a number of other physicians at

18   SCVMC. Their medical records are included in the administrative record. However, their opinions

19   are included in the opinions of the aforementioned physicians and neither the ALJ nor plaintiff

20   ascribed any weight to them.

21                          **II.  ANALYSIS**

22   **A.  Standard of Review**

23       The court has jurisdiction to review the Commissioner's decision denying benefits pursuant

24   to 42 U.S.C. § 405(g). However, the district court's scope of review is limited. The Commissioner's

25   decision (here the decision of the ALJ) will be disturbed only if it is not supported by substantial

26   evidence or if it is based upon the application of improper legal standards. 42 U.S.C. § 405(g);

27   *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In this context, evidence is substantial if it

28

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

1    is "more than a mere scintilla but less than a preponderance; it is such relevant evidence that a

2    reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Charter*, 108 F.3d

3    978, 980 (9th Cir. 1997). To determine whether substantial evidence exists to support the ALJ's

4    decision, the court examines the administrative record as a whole and considers evidence both

5    supporting and detracting from the Commissioner's conclusion. *Tackett v. Apfel*, 180 F.3d 1094,

6    1098 (9th Cir. 1999). Where evidence exists to support more than one rational interpretation, the

7    court must defer to the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005);

8    *Sandgathe*, 108 F.3d at 980.

9          Substantial evidence requires "such relevant evidence as a reasonable mind might accept as

10   adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining

11   whether the decision is supported by substantial evidence, the court must consider the record as a

12   whole, "weighing both the evidence that supports and the evidence that detracts from the

13   Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may

14   not substitute its judgment for that of the commissioner. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035

15   (9th Cir. 2007). However, neither may the court "affirm simply by isolating a specific quantum of

16   supporting evidence." *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). "The court's review

17   is limited to the reasons the ALJ provided in the disability determination." *Marovich v. Colvin*, No.

18   4:12-cv-06366-KAW, 2014 WL 900917, at *4 (N.D. Cal. 2014). Therefore, the court may not

19   affirm using a basis upon which the ALJ did not rely. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th

20   Cir. 2003). Finally, the court "may not reverse an ALJ's decision on account of an error that is

21   harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

22         Where there are conflicting medical opinions, the ALJ must determine the credibility of the

23   parties and resolve the conflict. *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). "Greater

24   weight must be given to the opinion of treating physicians, and in the case of a conflict 'the ALJ

25   must give specific, legitimate reasons for disregarding the opinion of the treating physician.'"

26   *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (quoting *Matney*, 981

27   F.2d at 1019). However, "[t]he ALJ need not accept the opinion of any physician, including a

28

treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). When an ALJ rejects either a physician's opinion on disability or diagnosis, he "must do more than offer his conclusions," and "must set forth his own interpretations and explain why they, rather than the doctor's, are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

**B.  The ALJ Properly Supported Her Decision With Substantial Evidence**

Plaintiff contends that the ALJ failed to support her findings with substantial evidence. Specifically, plaintiff contests the ALJ's evaluations of the opinions of Doctors Acenas, Tan, and Bush. Plaintiff also disputes the ALJ's determination that plaintiff lacks credibility. The court considers each argument in turn.

**1.  The ALJ Properly Supported Her Weighting of Dr. Acenas's Mental Findings With Substantial Evidence**

Plaintiff argues that the ALJ misinterprets Dr. Acenas's mental status findings in determining that plaintiff's mental status is "essentially normal." Mot. at 7. Plaintiff also contends that such a conclusion is against the weight of the evidence because plaintiff was involuntarily committed "only slightly more than a month" after Dr. Acenas's prediction that plaintiff's likelihood of recovery was good. *Id.* Plaintiff points to several areas where she could be construed to have below normal results. Plaintiff's Reply Brief ("Reply"), Dkt. No. 19 at 2. However, the ALJ accounted for plaintiff's commitment and subsequent recovery with proper medication.

Plaintiff's allegation that the ALJ misconstrued Dr. Acenas's opinion is not supported by the record as a whole. Dr. Acenas diagnosed plaintiff with a Global Assessment of Functioning ("GAF") score of 70, which corresponds to mild symptoms with the patient "generally functioning pretty well." AR 324; *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. text rev. 2000). Additionally, Dr. Acenas listed a prognosis that plaintiff's "likelihood of recovery is good." AR 325. Further, Dr. Acenas noted that plaintiff's depression was mild, that, with treatment, plaintiff was capable of "performing work activities on a consistent basis, maintain regular attendance in the workplace, and complete a normal workweek," as well as "deal with the usual stress encountered in a competitive workplace." *Id.* at 21, 325. Taken as a whole, Dr. Acenas's

records indicated that plaintiff would be "essentially normal" if she maintained her medical treatment. AR 16.

Plaintiff's argument that no mention was made of her involuntary commitment one month after Dr. Acenas's findings is similarly without merit. The ALJ considered plaintiff's commitment in finding that plaintiff's major depressive disorder was a severe impairment under step two analysis. AR 16. The ALJ also discussed plaintiff's commitment when evaluating plaintiff's potential mental impairments under step three analysis, but ultimately found that other evidence (mentioned above and throughout this order) outweighed plaintiff's commitment. *Id.* at 18. Therefore, the ALJ properly considered, and rejected with substantial evidence, facts counter to Dr. Acenas's medical opinions.

### 2. The Weight Given To The Opinion Of Dr. Giselda Tan Was Supported By Substantial Evidence

Plaintiff next argues that the ALJ failed to explain the weight given to Giselda Tan, one of plaintiff's treating psychologists. Mot. at 9. Specifically, plaintiff argues that the ALJ failed to provide findings regarding Dr. Tan's determination that plaintiff had a GAF score of 45-50, which was lower than that found by the other doctors. *Id.* However, the ALJ supported her decision with the record as a whole by referencing Dr. Tan's opinion of plaintiff's recovery, six months after the initial GAF finding. AR 16.

While plaintiff is correct that the ALJ did not explicitly mention Dr. Tan in the residual functional capacity section, the ALJ provided details using the record as a whole. *See* AR 16-18, 20-22. Dr. Tan initially diagnosed plaintiff with a GAF of 45-50, along with a major depressive disorder. AR 481. However, six months later, Dr. Tan recorded that plaintiff was "feeling well," "had not gotten depressed," "was thinking positive," and "fe[lt] calmed and relaxed." AR 465. Dr. Tan concluded that plaintiff's "affect and mood [were] within normal limits." *Id.* This followed a pattern of treatment in which plaintiff's depression abated and her overall assessment returned to normal. *Id.* at 465-69. Once plaintiff stopped taking her medications, she returned to being depressed, but was still "polite and expressive." *Id.* at 464.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    The ALJ adequately discussed Dr. Tan's findings in her assessment. While the ALJ did not

2    specifically state how she weighted Dr. Tan's opinion at steps three through five, such an assertion

3    is not required. *Magallanes v. Bowen*, 881 F.2d at 755 (noting that court "does not require such an

4    incantation" from the ALJ in order to determine the weight given to various experts). The ALJ

5    noted the temporary nature of plaintiff's condition. AR 16. The ALJ further mentioned the

6    improvement that Dr. Tan observed. *Id*. at 16, 464-84. Accordingly, the ALJ properly considered

7    Dr. Tan's opinions.

8        **3.  The Rejection of Dr. Bush's Opinion Was Supported By Substantial Evidence**

9        Plaintiff argues that the ALJ improperly rejected the opinion of treating physician Dr.

10    Thomas Bush. Mot. at 10. However, the ALJ's decision to apply no weight to Dr. Bush's opinions

11    was supported by his own findings, the records of the other treating physicians and by plaintiff's

12    sworn testimony. AR 21.

13        The opinion of a treating physician is given greater weight than that of a physician who did

14    not treat the plaintiff. *Lester*, 81 F.3d at 830. Where the treating doctor's opinion is contradicted by

15    another doctor, the ALJ cannot reject the treating doctor's opinion without "providing 'specific and

16    legitimate reasons' supported by substantial evidence in the record for so doing." *Id*. (citing *Murray*

17    *v. Heckler*, 722 F.2d at 502). "When an examining physician relies on the same clinical findings as a

18    treating physician, but differs only in his or her conclusions, the conclusions of the examining

19    physician are not 'substantial evidence.'" *Orn*, 495 F.3d at 632. However, when the examining

20    physician provides "independent clinical findings that differ from the finding of the treating

21    physician," those findings qualify as "substantial evidence." *Miller v. Heckler*, 770 F.2d 845, 849

22    (9th Cir. 1985). While the examining physician's testimony is not enough on its own to reject a

23    treating physician's opinion, additional evidence, such as that from laboratory test results and

24    contradictory testimony from the plaintiff, may suffice to outweigh the treating physician's opinion.

25    *Magallanes*, 881 F.2d at 751-52.

26        Dr. Bush's opinions were contradicted by his own findings, by other treating physicians and

27    by plaintiff's sworn testimony. AR 21. Dr. Bush asserted that plaintiff could only use her hands to

28

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

grip and manipulate objects for approximately 30% of an eight hour day. AR 349. Further, Dr. Bush asserted that plaintiff could never stoop, squat, twist, or lift an object over 10 lbs. *Id.* at 348-49. However, Dr. Bush's notes from October 2010 state that plaintiff has no hand synovitis. *Id.* at 353-54. The notes also do not mention any other hand or arm related impairments other than the general diagnosis of Reiter's Syndrome. *Id.* Dr. Bush's June 2010 notes find "no joint deformity, heat, swelling, erythema, or effusion" in plaintiff's hands and hips. *Id.* at 363. Plaintiff's hands and hips also had full range of motion. *Id.* Several other treating doctors who work for Dr. Bush observed that plaintiff's extremities appear normal. *See id.* at 357, 359.

Dr. Bush's medical opinions were also contradicted by other physicians. Dr. Michelle Rowe performed a full examination of plaintiff in February 2010, finding that plaintiff could stand up to six hours, that plaintiff had no limitations with regards to sitting, and that plaintiff had full upper-extremity strength with 4/5 grip strength. *Id.* at 282-85. Dr. Moore, a non-examining physician, came to similar conclusions as Dr. Rowe when using the record developed by Dr. Bush. *Id.* at 69. He determined that plaintiff could stand for two to four hours and sit for six to eight, but that Dr. Bush's determination of decreased fine motor skills in plaintiff's hands was unsupported by the record.

Finally, Dr. Bush's opinions were contradicted by the testimony of the plaintiff. Plaintiff testified that she worked for 9 months as a preschool teacher, which periodically required lifting fifty pound children. *Id.* at 75-76. Plaintiff's various claims of daily living also contradicted Dr. Bush's opinions as to plaintiff's impairments. Plaintiff performed light sweeping for up to an hour at a time, an activity that required standing and use of the upper extremities. *Id.* at 184. Plaintiff went out alone four times a week, in addition to periodic all day shopping trips with her mother. *Id.* at 185. Plaintiff's errands with friends and family members to church, the bookstore, and for coffee further contradicted Dr. Bush's opinion that plaintiff had very limited use of her upper extremities and was incapable of standing for more than 10 minutes. *Id.* at 186.

Plaintiff also briefly argues that the ALJ failed to sufficiently develop the record because the ALJ did not request an explanation for any of Dr. Bush's missing records. Mot. at 10. "In Social

United States District Court
For the Northern District of California

Security cases the ALJ has a special duty to fully and fairly develop the record and to assure that the plaintiff's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). The duty to develop the record exists "even when the plaintiff is represented by counsel." *Smolen*, 80 F.3d at 1288. If the ALJ believes that she needs to know the basis of the treating physician's opinions in order to evaluate them, she "has a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them." *Id.*

The ALJ fulfilled her duty to develop the record because she had adequate information to evaluate Dr. Bush's opinions. The ALJ's rejection of Dr. Bush's opinions was not based solely on the fact that medical records were missing. As outlined above, Dr. Bush's opinions were contradicted by independent examination, outside medical experts relying on his records, and by the plaintiff's sworn testimony. The record as a whole was sufficient to evaluate Dr. Bush's medical opinions, even given the limited notes that Dr. Bush provided.

### 4. The ALJ's Negative Credibility Finding as to the Plaintiff Was Supported by Substantial Evidence in the Record.

Plaintiff argues the ALJ's finding that the plaintiff was not credible is not supported by the record. Mot. at 7. Specifically, plaintiff argues that the ALJ (1) failed to consider the episodic nature of plaintiff's complaint and (2) misstated and took evidence out of context. *Id.* However, in her testimony before the ALJ, plaintiff did not allege having an episodic disability. AR 75-92. Additionally, plaintiff has presented no evidence that her obesity is episodic. The ALJ's negative credibility finding was supported by substantial evidence in the record from plaintiff's contradictory statements regarding her impairments and daily activities.

The ALJ is "responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). However, the findings of the ALJ "must be supported by a specific, cogent reason for the disbelief." *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Once a plaintiff "produces objective medical evidence of an underlying impairment, an adjudicator may not reject a plaintiff's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991). "General findings are

United States District Court
For the Northern District of California

1  insufficient; rather, the ALJ must identify what testimony is not credible and what evidence

2  undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). In

3  determining the plaintiff's credibility, the ALJ may take into consideration "unexplained or

4  inadequately explained failure to seek treatment or to follow a prescribed course of treatment."

5  *Smolen*, 80 F.3d at 1284.

6       A plaintiff's attempts at leading a normal life should not be held against her. *Reddick*, 157

7  F.3d at 722. *See also Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (noting that a disability

8  plaintiff need not "vegetate in a dark room" in order to be eligible for benefits). "Only if the level of

9  activity were inconsistent with [c]laimant's claimed limitations would these activities have any

10  bearing on [c]laimant's credibility." *Reddick*, 157 F.3d at 722.

11       The record shows that plaintiff engaged in "inconsistent compliance with her medications."

12  AR 19. Further, when plaintiff was correctly taking her medications, her "depressive symptoms

13  appear[ed] to be well controlled." *Id.* Plaintiff's failure to take her medications as part of a

14  prescribed course of treatment cast reasonable doubt onto her assertions about the severity of her

15  depression and provided substantial evidence in the record to support the ALJ's negative credibility

16  finding with regard to plaintiff's depression.

17       In addition, plaintiff obtained a degree in early childhood education in 2008. Plaintiff began

18  the degree at Bethany University, but after one semester returned home to pursue the degree online.

19  Plaintiff argues that the ALJ misinterpreted this evidence as contradicting plaintiff's claim that she

20  has social limitations. Plaintiff contends that the degree supports her claim of having a severe social

21  limitation because she was forced to finish the degree online in order to avoid interpersonal

22  interaction. Mot. at 6.

23       The ALJ's decision rested not on the act of finishing the degree online, but on the nature of

24  the degree itself. Opp. at 5. Plaintiff claims that her impairment is such that she has difficulty getting

25  along with others. AR 192; Mot. at 6. However, the fact that plaintiff chose to pursue a career in

26  early childhood education, a field involving substantial interaction with children, coworkers,

27  employers, and numerous parents, weighs heavily against finding that plaintiff has a disabling social

28

1    impairment. The record further indicates that plaintiff satisfactorily interacted with others when she

2    worked full-time at a preschool. AR 75-76.

3        With regard to plaintiff's physical symptoms, the record contradicts plaintiff's testimony on

4    several points. While plaintiff's attempts at working should not be held against her, the activities

5    that she engaged in during the course of her employment cast a plausible doubt as to her credibility.

6    Plaintiff testified that she worked full-time as a preschool teacher for "the last half of the year [she]

7    started there and up until April or May." AR 75-76. During her time as a preschool teacher, she was

8    required to lift children who needed comfort, some in excess of 50 pounds. AR 76. Additionally, the

9    record reflects that plaintiff spent some time conducting activities of daily living, such as light

10   sweeping. *Id.* at 184. Plaintiff went on an all-day shopping trip once a month. *Id.* at 185. She also

11   ran errands with others four times a week, went to church, stores, the bookstore and, on occasion,

12   Starbucks. *Id.* at 186. Such actions cast doubt upon plaintiff's testimony that she could stand for

13   only eight minutes at a time and at most ninety minutes over an eight hour period. *Id.* at 86.

14       Accordingly, the ALJ has provided substantial evidence supporting her opinion that the

15   plaintiff's testimony was not credible by advancing several examples where plaintiff's assertions of

16   impairments were contradicted by her testimony and the record.

17   **C.  The ALJ Properly Took into Account Plaintiff's Supraventricular Tachycardia and
         Hyperthyroidism**

18

19       Plaintiff also argues that the ALJ failed to consider plaintiff's SVT and hyperthyroidism in

20   connection with plaintiff's other ailments when determining that she did not equal or exceed any of

21   the listed impairments in Appendix 1 to Subpart P of 20 C.F.R. § 404. Mot. at 6. However, the ALJ

22   properly determined at step two that plaintiff's SVT and hyperthyroidism were either not present or

23   insignificant, so the ALJ need not have weighed these ailments in combination with plaintiff's

24   actual ailments at steps three or four.

25       The ALJ addressed plaintiff's SVT and hyperthyroidism in her step two analysis. She noted

26   that laboratory testing in October 2009 showed a thyroid condition; however, a physical

27   examination "showed normal limits, with no nodules or bruits." AR 15. While Dr. Tom prescribed

28   medication for plaintiff's hyperthyroidism, the ALJ observed that the plaintiff never filled the

1    prescription. *Id.* By March 2010, "the claimant denied any symptoms related to hyperthyroidism."

2    Accordingly, the ALJ concluded that plaintiff does not suffer from hyperthyroidism.

3         Similarly, the ALJ found that plaintiff's SVT was no longer an impairment. She noted that

4    plaintiff has had "no episodes documented or related limitations since the application date." *Id.* at

5    15, 316. Additionally, the ALJ cited a progress note stating that "the claimant was no longer taking

6    any medications for this condition." *Id.* at 15. Using this evidence, the ALJ concluded that "[t]he

7    objective medical evidence does not support the claimant's allegation of a severe heart condition."

8    *Id.* at 15. She further noted that it appears that based on the evidence in the record, the plaintiff's

9    "symptoms have resolved spontaneously." AR 15.

10        Because plaintiff no longer had symptoms of hyperthyroidism or SVT, it was unnecessary

11   for the ALJ to include them in her step three or four analysis. In fact, the plaintiff made no

12   allegation that her hyperthyroidism or SVT meets the high bar for automatic disability under step

13   three, nor did the plaintiff present any evidence that her hyperthyroidism or SVT was relevant in

14   establishing equivalence with any of the impairments listed in the appendix. "An ALJ is not

15   required to discuss the combined effects of a plaintiff's impairments or compare them to any listing

16   in an equivalency determination, unless the plaintiff presents evidence in an effort to establish

17   equivalence." *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) (citing *Lewis v. Apfel*, 236 F.3d

18   503, 514 (9th Cir. 2001)). As plaintiff did not present evidence to establish equivalence and as the

19   ALJ found that plaintiff no longer suffers from hyperthyroidism or SVT, the ALJ properly omitted

20   plaintiff's alleged hyperthyroidism and SVT from the step three and step four analysis.

21   **D.  The ALJ's Definition of "Moderate" to the Vocational Expert Was Not Improper**

22        Plaintiff lastly argues that the ALJ's definition of the term "moderate" in the questions posed

23   to the vocational expert was improper. Mot. at 10. Plaintiff also contends that the ALJ's definition

24   of "moderate" is inconsistent with the ALJ's finding that "plaintiff's depressive disorder is a severe

25   impairment." Mot. at 11. Neither argument is compelling.

26        In discussing a number of hypothetical questions with the vocational expert, the ALJ asked

27   if jobs would be available to someone who had to change positions every 30 minutes, with "a

28

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    moderate limitation for the ability to understand, remember and carry out detailed instructions; had

2    a moderate limitation in the ability to work in coordination or proximity to others without being

3    distracted by them; and a moderate limitation in the ability to interact appropriately with the general

4    public." AR 97. The ALJ then defined moderate to the vocational expert as "the individual has more

5    than a slight limitation in this area but the individual could still—is still able to perform the function

6    satisfactorily as it's defined in the Form HA-1152-U3 of . . . one of the Agency's forms." *Id.*

7         The ALJ's definition of "moderate" is consistent with the Social Security Administration's

8    definition of "moderate." Form HA-1152-U3 defines a "moderate" limitation as "[t]here is more

9    than a slight limitation in this area, but the individual can still function satisfactorily." Office of

10   Disability Adjudication and Review, Social Security Administration, Form HA-1152-U3, Medical

11   Source Statement of Ability to Do Work-Related Activities (Mental). Accordingly, the ALJ's

12   explanation of a "moderate" limitation as one which still allows the individual to "perform the

13   function satisfactorily" was proper.

14         Plaintiff's contention that the ALJ's definition of moderate conflicts with the ALJ's finding

15   that plaintiff's depressive disorder is a severe impairment is also unpersuasive. Plaintiff conflates

16   the ALJ's analysis at step two, which found that plaintiff's depressive disorder is a severe

17   impairment, with the ALJ's discussion of plaintiff's limitations in the four functional areas at steps

18   three through five, which considers whether plaintiff's severe impairment is sufficiently severe to

19   render her disabled. The ALJ determined that while plaintiff's depressive disorder is a severe

20   impairment, it is not sufficiently severe to render her disabled, alone or in combination with

21   plaintiff's physical impairments. Furthermore, a hypothetical question is objectionable "only if the

22   assumed facts could not be supported by the record." *Sample v. Schweiker*, 694 F.2d 639, 644 (9th

23   Cir. 1982). The ALJ's hypothetical question to the vocational expert was supported by the record, as

24   the ALJ found that plaintiff had either moderate or mild limitations in each of the four functional

25   areas. To the extent the ALJ's hypothetical question deviated from the ALJ's findings, it was in

26   plaintiff's favor by characterizing plaintiff's limitations as moderate, rather than mild. Therefore,

27   the ALJ's hypothetical question and definition of a "moderate" limitation were appropriate.

28

### III.  ORDER

For the reasons explained above, the court DENIES plaintiff's motion for summary judgment and GRANTS defendant's cross-motion for summary judgment.


Dated: March 10, 2015

Ronald M. Whyte
United States District Judge

United States District Court
For the Northern District of California